GOVERNMENT EXHIBIT A

# DECLARATION

I, Bryan Moultis, pursuant to 28 U.S.C. § 1746, under penalty of perjury and pursuant to the laws of the United States, state that the following is true and correct to the best of my knowledge and belief:

1. I, Bryan T. Moultis, am a Special Agent (S/A) of the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I have been employed over four years as an HSI SIA and have completed the DHS Federal Law Enforcement Training Center (FLETC) Criminal Investigator Training Program (CITP). I am currently assigned to the HSI Resident Agent in Charge Raleigh, North Carolina Field Office (HSI RAC/RA) and my duties include conducting criminal investigations for violations of Titles 8, 18, 19 and 21 of the United States Code, to include violations of immigration offenses, trafficking of contraband and prohibited goods into the United States, attempting to obtain visas by fraud, making false statements, and intellectual property rights infringements. Prior to my appointment as an HSI S/A, I was employed as a civilian SIA with Army Criminal Investigation Command, Major Procurement Fraud Unit for a period of two years, where I performed sophisticated fraud and corruption investigations. This declaration is based on my own knowledge and experience as well as information provided by other federal, state, and/or local law enforcement agencies.

2. This declaration is made in support of the forfeiture of $22,930 in U.S. currency seized from Sidialy El Ghoth Diaafar pursuant to 18 U.S.C. § 981(a)(1)(C) as proceeds of a violation of 18 U.S.C. § 2342 (trafficking in contraband cigarettes/tobacco).

3. This forfeiture action arises from a traffic stop of Sidialy El Ghoth Diaafar ("Diaafar") during an interdiction operation while law enforcement officers were investigating illegal trafficking of contraband cigarettes and/or controlled substances in Cumberland County and elsewhere in North Carolina.

### Knowledge, Training, and Experience

4. Your affiant and members of the Cumberland County Sheriff's Office Criminal Interdiction unit have attended specialized training in interdiction operations, as well as accumulated knowledge, training, and experience as it relates to tobacco smuggling operations. Both agencies are also members of a vast network of interdiction officers that specialize in tobacco smuggling including common themes, smuggling trades, patterns, trends, smuggling methodologies, and known smuggling personalities which are often broadcasted throughout this network to ensure interdiction officers are made aware of the same. Below are some common items or smuggling methods often encountered:

    4a. Grocery bags - in tobacco smuggling investigations, a significant number of experiences in the smuggling of bulk cash relating to the illegal sales of tobacco often result in smugglers utilizing black plastic bags to conceal money. These bags often come

1

from the very tobacco retail stores used as fronts to launder proceeds of illegal activity. These bags are often placed inside various natural cavities throughout the vehicle, as opposed to bank bags often used by legitimate business persons. In some instances, legitimate bank bags are discovered with separate portions of money contained within. In other cases, a small portion of bulk cash is placed in plain view to attract the attention of a law enforcement officer so that the search will cease in order for the discovered money to be discussed, with the hope law enforcement will be satisfied with the story and discontinue the search; all he while a separate sizeable amount of bulk currency remains concealed in the vehicle in a different compartment.

4b. Use of rental cars – the frequent use of rental cars is often an indicator that foul play is afoot. Smugglers will often rent vehicles for several purposes to include:

i. The use of a rental car adds a degree of covertness as smugglers names are no longer tied to license plates which are often subject to inspection by interdiction officers and license plate readers throughout the Interstate system. In some instances, the smuggler is not the person who rents the vehicle, as smugglers who have been previously caught require a third party to rent the vehicle for them to add a degree of separation for the purpose of avoiding suspicion. Smugglers also use rental vehicles for the same purpose while sourcing cigarette locally in North Carolina to stash them prior to making a longer trip to a state such as New York where the cigarettes will be sold, and the money will be smuggled south.

ii. Smugglers often make treks up and down the Interstate system causing mileage to increase significantly on vehicles. The use of rental cars keeps smugglers from having to use personal vehicles, mitigating wear and tear. HSI Raleigh, during the course of this investigation has observed tobacco smugglers rent vehicles year-round to the point rental companies have sold the vehicle after one rental contract due to the mileage accrued by the smuggler exceeded 100,000 miles.

iii. Luggage and Travel – tobacco smugglers often make trips from North Carolina to New York in one overnight trip. Some smugglers will often use diapers or paper towels for the purpose of relieving themselves while driving to minimize the amount of stops needed to make the trip. Often, upon inspection, smugglers will provide law enforcement officers itineraries that exceed day trips which would require a common person to take a change of clothes, toiletries, and other related items with them. The lack of these items indicates the multi-day itineraries are likely fabricated.

iv. Direction of travel – the direction of travel on the Interstate system is often indicative of what phase of the tobacco smuggling operation is occurring. Smugglers interdicted north bound will often have large loads of cigarettes contained within their vehicle. Smugglers traveling south bound are often encountered with bulk currency, which are the illegal proceeds received in New York sent back to North Carolina for the purpose of purchasing additional cigarettes.

v. Use of blankets, sheets, and tarps – tobacco smugglers often choose vehicles with large internal cargo areas such as SUV's and pickup trucks. In order to

conceal bulk tobacco products, tobacco smugglers will often use black sheets, blankets, or tarps to emplace over the contraband cigarette load as to conceal the contraband cigarettes from plain view from outside persons such as police officers approaching the driver side window during a traffic stop.

### The May 2, 2019 Seizure of $22,930

5. On May 2, 2019 Corporal (Cpl.) Kevin Hamlet of the Cumberland County Sheriff's Office performed a traffic stop on a 2019 Ford Escape registered to Hertz Vehicles, LLC after observing the driver speeding, following too closely, and failing to maintain lane. The stop took place on Southbound I-95 near North Carolina Highway 87 in Fayetteville, North Carolina

6. During the stop, Corporal Hamlett asked for Diaafar's driver's license and the vehicle rental agreement. Diaafar reached into the center console to retrieve the documents, exposing a black plastic bag. Corporal Hamlett asked Diaafar to exit the vehicle and come to the front passenger window of his patrol car while he checked on Diaafar's driver's license. Diaafar, the only occupant of the vehicle, stated that he was traveling from Bronx, New York, to Butters, North Carolina to visit a friend for two days (until May 4, 2019). Corporal Hamlett noted that Diaafar's car rental agreement showed that the car had to be returned in New York on May 3, 2019, and that there was no luggage in the vehicle.

7. After completing the license check, Corporal Hamlett exited his vehicle and returned Diaafar's license and rental agreement. He then asked Diaafar if he could ask him a few questions before he left, and Diaafar agreed. Corporal Hamlett asked whether Diaafar had any drugs or large sums of money. Diaafar said no, but began to exhibit signs of nervousness, such as not making eye contact, his voice rising in pitch, and his speech becoming faster. According to Corporal Hamlett, though Diaafar's first language is not English, they were initially able to communicate without difficulty, but that Diaafar struggled to communicate clearly when responding to these questions. Corporal Hamlett asked multiple times if he could search the vehicle, but he indicated the Diaafar was "in disarray" and unable to easily communicate any longer. Due to Diaafar's nervousness and speech, Corporal Hamlett asked him to stand to the side of the vehicle, which Diaafar did. Corporal Hamlett then requested the CCSO K9 Unit to respond to perform a free air sniff. While Corporal Hamlett contacted the K9 Unit, Diaafar told Sergeant Tim Bailer that he had $22,000 in the vehicle, which Diaafar said he was bringing to a friend.

8. When the K9 Unit arrived, Sergeant J. Salisbury's canine alerted to the odor of narcotics in a free air sniff. Corporal Hamlett and Sergeant Bailer then commenced a search of the vehicle, which revealed a large sum of U.S. currency in a black plastic bag in the center console. The only clothing located in the vehicle was a jacket on the back-seat floorboard. The search also revealed a blanket next to the jacket, and another blanket in the rear storage area of the SUV. When questioned about the large sum of currency, Diaafar gave conflicting information, stating initially that he was bringing it to a friend, then that he was buying a business, and finally that he was investing in a business with a friend who lived in Butters, North Carolina. When asked the name of his business

3

partner, Diaafar could not provide a last name for the individual. When Corporal Hamlett asked, "So you are going to give $22,000 to a person to invest in a business and you don't even know his last name?" Diaafar responded only with, "He's my friend." When asked what he did for a living, Diaafar said he was an Uber driver and that he made a lot of money. (It should be noted that Diaafar possessed a temporary visitor New York driver's license set to expire October 11, 2019.) Diaafar stated that he does use a bank, but did not clarify why the money was not in the bank. He stated that there was $22,270 in the black plastic bags, and he wrote the name and address of the person he said he was going to give it to on a piece of paper (Tareq, 5630 Fountain Grove Circle, Fayetteville, NC 28304). The address given was in Fayetteville, North Carolina, rather than Butters, as Diaafar had previously identified as his destination.

9. Based on my own training and experience and that of others involved in this investigation, the currency was packaged and concealed in a manner consistent with illegal activity such as cigarette trafficking. The currency was stacked, bundled, and banded and wrapped in a black plastic bag similar to those used in a conveyance store. The currency was not banded with currency bands, which are typically found when currency is withdrawn from a bank, but rather plain gum-colored rubber bands. Further, when the seized currency was taken to a bank for an official count, the bank teller found two counterfeit $20 bills, demonstrating the unlikelihood of the currency originating from any financial institution.

10 Based on my own training and experience and that of others involved in this investigation, the average cost of a carton of cigarettes (brand immaterial) is $56.00 per carton in the state of North Carolina. The seizure of $22,270 in bulk currency will purchase approximately 400 cartons of cigarettes in North Carolina, which is a contraband quantity as defined by 18 U.S.C. § 2341(2). Further, a mid-sized SUV such as the Ford Escape Diaafar was driving can hold up to 500 cartons of cigarettes. Once the cigarettes have been smuggled into New York, they can be illegally sold without payment of taxes for as much as $114.00 per carton. Each trip in which 400 cartons of cigarettes is smuggled from North Carolina to New York can potentially generate $45,000.00 in proceeds, approximately half of which is profit and the remainder of which is then available to purchase another load of cigarettes in North Carolina.

## CONCLUSION

11. Based on the foregoing, probable cause exists to believe that the aforementioned $22,930 in U.S. currency constitutes or is derived from proceeds traceable to specified unlawful activity, as defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1), including trafficking in contraband cigarettes.

12. The foregoing facts are therefore sufficient to support a reasonable belief that the $22,930.00 in U.S. currency is forfeitable to the United States pursuant to Title 18, U.S.C. § 981(a)(1)(c).

Executed this 3rd day of October, 2019

*(signature)*

Bryan Moultis
Special Agent
Homeland Security Investigations